The next case this morning is 523-0603, People v. Tilley. Arguing for the appellant is Emily Boyk. Arguing for the appellee is Becky Ray. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Thank you. We'll try this again. Ms. Boyk, are you ready to proceed? I am, Your Honor, and I apologize for the delay. Thank you. It's not your fault. While you were out, we were discussing. I had computer issues the last two days. I was locked out of my own computer, so we understand how that happens, but glad you're back. Thank you. We have read the briefs. We're familiar with the facts and the arguments in the briefs, but so you don't need to go into the facts again, but just jumped right into argument as appropriate. Thank you. You may proceed when you're ready. Thank you, Your Honor, and again, good morning to Your Honors, to counsel, and may it please the court. My name is Emily Boyk with the Office of the State Appellate Defender, and I represent Michael Tilley in this appeal. This appeal focuses on the 27 seconds after Ms. Michael Tilley answered his door, where the officers entered his home without a warrant and arrested him for resisting or obstructing a peace officer. During those 27 seconds, Mr. Tilley did not raise his voice, did not make any threats, and did not act violently toward the officers or toward anyone else. To the contrary, Mr. Tilley offered to retrieve the woman inside the house whom the officers wanted to speak with, an offer that the officers seemingly accepted. But as Mr. Tilley began to retrieve the woman, the officers stepped into his house, forcefully pulled him to the ground, and arrested him. And they arrested him not for the domestic disturbance they had been called to respond to, but instead for obstructing their warrantless entry into his home. Ultimately, the evidence in this case demonstrates that Mr. Tilley was arrested not because he actually resisted or obstructed the officers' investigation, but because the officers were worried that he might do so. Therefore, the state failed to prove that Mr. Tilley both materially obstructed the officers and that the officers were engaged in an authorized act, and we ask that this court reverse his conviction. Turning first to the issue of material obstruction, the state failed to prove that Mr. Tilley materially obstructed the officers in their investigation. As the state agrees, in order for Mr. Tilley to be convicted of resisting or obstructing, it was required to prove that Mr. Tilley's conduct hindered the officers in more than some negligible way. Yet the evidence at trial revealed that the only thing that Mr. Tilley did was question the officers' authority to be at his home for 27 seconds. But what about the notion that he was closing the door at the time? What about that idea that there was some testimony that he was closing the door? Yes, Your Honor. So, Sergeant Justice testified that when Mr. Tilley answered the door, he didn't open it all the way, that he was standing kind of at an angle, which seems to me to mean that he just kind of didn't open the door all the way. And then Mr. Tilley was speaking with the officers, and he offered to retrieve the woman inside the house. He said that if you want to speak with them, they'll gladly come and speak with you. And then, who I believe is Sergeant Justice responded, perfect. And immediately at that moment is when Mr. Tilley took a step backwards and the door began to close, start to close, based on the testimony. So, I think from these facts, it's fairly clear that Mr. Tilley was going inside the home to retrieve this person. That is, I think, what Sergeant Justice and what Officer Cook testified is what was happening. Sergeant Justice thought that maybe he wasn't genuinely going to be doing that. Officer Cook said he was genuinely doing that. And I think it is important to note that the officers never told Mr. Tilley not to go back into the residence. He was not disobeying any orders. They never told him to exit the residence. They never asked if they could come inside. So, the closing of the door in context was clearly about the officer. How were they to know that? I mean, did they even have time when he's closing the door? How do they know what he's doing at that point in time if he's going to close the door? Well, he did just offer to do that. And I think, again, the Sergeant Justice said perfect when he offered to do that. And so, Mr. Tilley had no reason to think that he was not supposed to do that. Because again, the officers had never given him that instruction. If the officers had told him, you cannot go back inside the residence, and he then started to close the door, then we'd be in a different situation. But here, Mr. Tilley was acting, in his mind, exactly as the officers wanted, because the officers were asking him who else is in the house. And he said, I'll go get you the people in the house. And the officer said, perfect. Didn't he first say when they asked who else was in the house, he said it doesn't matter? Yes, Your Honor. For approximately like 20 seconds, he says, it doesn't matter because this is my house. He's not answering their questions immediately. But again, he is not being violent. If you listen to the audio, and I think the audio here is very helpful, you hear he's being very calm with the officers. He's not raising his voice. What's the standard? What's the standard of review we apply here? Well, so for this, we're challenging, obviously, the sufficiency of the for this element, for both elements. And so that would be the light most favorable to the state. But again, we can hear on the audio, what Mr. Tilley actually sounded like and what he was saying, with his interaction with  Isn't it what the officers knew? They had a report of a woman, possibly things being thrown. They could hear the muffled sounds of a woman inside. You have a man blocking the door, because he won't open it fully. I mean, objectively, only one person said perfect when he said he would go get the woman. They don't know at that point what the woman is going, what's going on in the house. And yet he starts to close the door. Why isn't that enough? Yeah, Your Honor, for the same, yes, Your Honor, for the same, similar reasons, as I was just stating is because, again, and also, I think it's important to remember how fast this is happening, that Mr. Tilley offers to do this, the officer says perfect, and he starts to close the door. You're right that the officers didn't know what he was doing. Officer Cook testified that he believed that Mr. Tilley was genuinely going inside to retrieve the people that were in the house. Sergeant Justice testified that he wasn't sure that it was genuine. So it's not clear in that regard how that was actually read by the officers. But regardless, ultimately, they just had no information. And again, Mr. Tilley was not told not to go back into the home. He answered his door. Police officers were at his door. He did not immediately invite them in, but he was not required to do so. And so for that reason, the- But he wasn't, he wasn't helpful to them either. That's, that's true, Your Honor. And for the first 20 seconds, he was not helpful. But then he was helpful because he offered to retrieve the woman. He cooperated. He was initially saying, he asked, it doesn't matter. This is my home. And the officers were asking what, who else is at the house? The officers didn't tell him even that they had received a call for about 10 seconds. So, uh, Mr. Tilley- One officer says perfect, but the other officer, one officer says perfect, but the other officer says, I didn't know if he was going to close the door and not let us in, or he was going to get a weapon, or he was going to do something more to the woman. So if the test is in light, most favorable to the state, isn't the one officer's fears about what might be happening next sufficient? No, Your Honor, because the statute requires that the person, that the defendant actually obstruct the officers, something not that the officer, not something that the officers were worried he was going to obstruct. He had not actually done anything to obstruct their investigation yet. Had he actually closed the door and locked them out? Maybe that, yes, that could be obstruction, but he hadn't done that yet. The officers were, were preemptively stopping him from what they were worried he might obstruct them, which is not a material obstruction. The statute does not allow officers to preemptively prevent an obstruction that they worried could happen. And again, the officers had no reason to believe that Mr. Tilley was armed, uh, or that there were any weapons in the house. Um, I see my time is expiring. So, uh, for those reasons, Your Honor, we ask that you reverse Mr. Tilley's conviction for assisting or obstructing a peace officer. All right. Thank you. Other questions? Justice Cates? No, not at this time. Justice Shuler? No, thank you. All right. Ms. Boyk, you'll be given an opportunity for rebuttal in a moment. Ms. Ray, you ready to proceed? I am. All right. You may do so when you're ready. Thank you, Your Honors. May it please the court and counsel, I'm Becky Ray for the state, and I would first like to address some of the questions from the justices, um, regarding what, um, Justice Cates mentioned about the totality of the circumstances and only one officer saying that it was perfect for the defendant to go in and get, um, this victim. The officer, only one of them said perfect. The other one did not. Um, and neither of them consented to this defendant closing the door and separating the officers from the screaming female inside who they believed might need immediate medical assistance. So, um, I do believe that the obstruction had already occurred at the point where the defendant decided to shut the door. There was no speculation that it was going to occur. It had already done so. When the officers approached the home, here's what they knew. They had been dispatched to that home for a report of domestic violence by a third party caller. And generally, third party callers have no stake in what is going on inside the other person's residence. They just have a general concern for the well being of the victim. That seems to be what was present here. And that's what the officers knew that this neighborhood called saying it sounded like someone was being hit or something was being thrown. And there was a female screaming inside the residence. As the officers approached, it took them about four minutes to get there from the time they left the station to the time they arrived at the door. Um, and Officer Justice heard the female screaming. So it was either occurring this domestic incident, which they were responding to, was either occurring for approximately four minutes or was continuing to reoccur as they were approaching this residence. The defendant answered the door, bladed himself, that was the officer's description, basically put himself between the officers and the interior of the home, closed the door close to him so that the officers could not see. And they felt that he was trying to do that to keep them from seeing the female, an injured victim or who else was in the home. And that's supported by the fact that, uh, the defendant would not reveal whether or not there was anyone else in the home and who it was. And the officers had already seen another male in the home. So while they did not know whether one second Ray, I see we lost Justice Vaughn. Oh, he's okay. You're back, Justice Vaughn. I think so. Yes. Okay. I'm sorry to interrupt Miss Ray. That's okay. Go ahead. So while the officers may not have known whether or not this defendant was retreating into his residence, uh, to get a weapon, that is certainly something that they had been trained to prepare for. They had been given extensive training and responding to domestic violence calls, which by their very nature, very volatile and dangerous, not only to the participants in that the victim, but also to officers. So as this defendant is closing the door, they only had mere seconds to decide, as Justice Scholar said, and they did not know whether or not he was going inside to harm the victim further to retrieve a weapon, which people are known to scatter throughout their homes for their own defense and protection. Didn't know if he was going inside to get the other male or whoever else might have been inside because the officers still didn't know at this point, um, to engage in some fight or argument against the officers. So they only had seconds to decide this and in their training and experience and also by the Illinois Domestic Violence Act, they're required to provide immediate assistance to someone that they reasonably believed has been a victim of domestic violence and may be injured. So in these mere 27 seconds, which counsel continues to, um, deem significant, the officers had to decide what to do. And I submit to this court that the officers behaved reasonably under these circumstances. They knew certain things approaching this residence and they didn't give the defendant consent to shut the door, um, even though one of them apparently said it would be great if he would go get, uh, the victim inside. Um, they couldn't risk further injury or intimidation to the victim or injury, potential injury to themselves by letting him retreat inside the home and shut the door. They had a duty. They followed that duty and they were reasonable in the manner that they did that. They prevented him from, um, yes, that's right. Let me interrupt you just a moment. Can you have two things at once in that you can have a lawful entry into the premises under the circumstances you've just described and you can have the defendant not committing obstruction of justice. In other words, you can have the officers validly going into the premises without a warrant under exigent circumstances, for example, but you can also have a situation where no crime is being committed by this defendant. I think there are situations where that could occur. I don't think they occurred in this case. I think the obstruction, um, I think the obstructing had already occurred because even though just mere argument is not enough to, um, to constitute a material impediment, which is required for obstructing, there was more than just mere argument here. There was the uncooperativeness, which the defendant admits he was uncooperative, his confrontational demeanor, the potentially injured female inside, the fact that the defendant blocked the door didn't allow the officers to, um, wouldn't allow the officers to see inside the residence, would not identify who else was present or whether anyone else was present, um, and his defensive stance at the door and the fact that, um, he started to close the door on the officers while they were trying to determine whether or not they needed to render aid to someone inside. So, it is the state's position that while you could have a situation that required immediate attention and, um, uh, to the victim and not have obstructing, I don't believe it occurred in this case. And I, I think that, um, another factor in that while counsel, uh, indicates that, you know, it was only 27 seconds. Seconds matter when someone is injured and these officers did not know at this point, because of the defendant's obstruction, whether or not this female was injured or even near death, um, and whether they needed to render assistance to her. So, I believe in this case that, um, both are present, uh, Justice Cates, to answer your question, um, and I think that, um, their entry into the home is reasonable. Like the Supreme Court of the United States said, officers don't have to wait to see if someone else is going to be injured or worse before they enter under the emergency aid exception, and I believe that's what was present here. Now, fortunately, um, the victim was not physically injured or required emergency assistance, but the officers didn't know that because of the defendant's obstruction and not, um, allowing them to speak with her. And I don't think that his, um, later willingness to go get her was helpful. That if, if he was doing what the officers said that he was doing, and which that's testimony that, you know, taken in the light most favorable to the state, he was doing, he was closing the door and he was going to separate these officers from this potential victim. And at that point then, yes, they wouldn't have, you know, necessarily been able to get to her and render the emergency aid. Should I wait? We've lost Ms. Boyle. Yes. Yes, if you would. Can you stop the clock, Courtney? Yes, I thought I had stopped the first time, but I am going to ask her just to call in. Okay. Unpaused. All right. Ms. Ray, you may resume. Thank you. So, just to wrap up here, um, I believe the obstruction occurred throughout the, the time that the office... Now she's frozen. Ms. Ray, you're frozen. Gosh. Wow. Okay. Can everyone hear me? Yes. Okay. It's the state's position that the obstruction in this case occurred throughout the entire time that the officers were speaking with the defendant. From the time he opened the door, I think you have to consider the totality of those circumstances. From the time he opened the door and was uncooperative almost immediately and confrontational, wouldn't identify who was in the home, positioned himself in front of the door so the officers couldn't see. Officers couldn't determine whether or not there was an injury inside the home. So, I think the emergency exception continued to apply throughout that time until they were able to determine that there wasn't an emergency. And they weren't able to determine that until after they had already restrained the defendant and fallen to the ground with him. It was only after that point that they were able to actually see and speak with the female in this case to determine that she was not injured. Up until that point, they only knew that she had been screaming inside the residence. She wasn't visible. There was another male present there. The defendant was obstructing their view and not cooperative in answering them or letting them render aid to her. And so, for those reasons, the totality of the circumstances warranted the minimal or de minimis intrusion into the defendant's home to effectuate the purpose for which they were there, which was to answer a domestic violence call and to render emergency aid to the person that they believed was a victim of this domestic and could be injured and in need of medical assistance. I see the clock's not running, but I'm quite sure my time is up now. I ask this court to affirm for the reasons I've argued here today and also the reasons in my brief. Thank you. Thank you. Ms. Bork, you're still on mute, but are you ready to give your rebuttal? Thank you, Your Honors. Assuming we can all stay connected. Yes. Yes. Thank you, Your Honors. I wanted to make two brief points in response. First, regarding the yelling that Sergeant Justice testified he could hear as they approached the residence. Justice testified that he heard a woman yelling, but he also testified that he could not make out any substance from this yelling, and he agreed that it was entirely possible that the woman was just yelling to get someone's attention. It was not clear from this yelling. She was not clearly in distress. She was not clearly yelling for help or yelling out in pain. So the yelling by itself does not necessarily indicate that there's an emergency at hand that the officers need to go into the home for. And I also wanted to – This has been going on for a while because a neighbor called in the call. I assume the police weren't there instantaneously. The neighbor calls in. When they get there, they could still hear something inside. Isn't that right? Yes, Your Honor. That's right. But, again, the officers did not hear the woman that there was any indication from the yelling that something – that she was yelling out in pain or distress or yelling for help. There was nothing from that. Yes, some time had passed, but some time could have passed. Boy, women don't usually yell inside their house unless there's something amiss. Would you agree with that? It's not normal to be yelling for four minutes. If you're having an argument, you could be yelling. Or, you know, if there's reasons why someone could be yelling inside their house, that doesn't mean they're being attacked or beaten, certainly. Well, but the officers – That material – The officers knew from a call that something was being thrown or there was a sound of something broken or – Yes. Yes, Your Honor. That's correct. And that's exactly why the officers had every right to investigate this call. The officers had every right. They were fully authorized to approach the residents, to knock on the door, to ask what was going on, to investigate. The officers were – And I want to ask you about that because this is why I asked Ms. Ray if you could have two things going on at once. That is, you could go into the house and still not obstruct. But the statute says that it's somebody who knowingly obstructs the performance of one known to be a police officer who's within his or her official capacity. So if these officers knew that there was a reason to go in, then they had the official capacity, didn't they? To question this guy and ask him about who was inside. And for those 27 seconds, he's not giving them what they need. Yes, Your Honor. They had the – They were authorized to at the front door, to knock on the front door, as they did when Mr. Tilley answered the door to ask Mr. Tilley questions at the front door. They were authorized to do that. They were not authorized to enter the home unless they had probable cause and exigent circumstances to do so. And the authorized act that Mr. Tilley was charged and convicted of obstructing is not them asking questions. He is convicted of obstructing their entry into his home. And I think that's an important distinction here because that's what he supposedly obstructed. The state has to prove that the officers were allowed to enter his home under the Fourth Amendment. And it's our position that the officers did not have probable cause and exigent circumstances to do that. So I agree that certainly Mr. Tilley was not immediately forthcoming. He did not immediately open his door wide and invite the officers into his home. But he was not required to do that as a homeowner. Furthermore, the officers never asked him to do that. The officers never asked him to come outside. They never asked him to tell him that he could not go into the residence. And notably, within 42 seconds, this woman that the officers wanted to speak with came outside. So there was really very little disruption of the officers' investigation here. And Mr. Tilley's- But they didn't recognize. They wouldn't have known that at the time that he was shutting the door and they came in, right? I mean, they wouldn't have known where she was in the building or what was happening. I mean, reasonableness would say that they would not know what they were walking into, correct? Correct, Your Honor. They did not know that. But Mr. Tilley also did not know that he wasn't supposed to shut the door. Mr. Tilley was never told not to do that. He was never ordered that he could not do so. So Mr. Tilley did not knowingly obstruct the officers against an order he never received. My time has expired. So I will just say again, because the state has failed to prove that Mr. Tilley materially obstructed the officers and that the officers were engaged in an authorized act, we would ask this court reverse his conviction for resisting or obstructing a peace officer. Thank you. Thank you. We appreciate both your arguments. We'll take those into consideration together with the briefs you have on file. We will take the matter under advisement and issue a decision in due course.